# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

E.B. and K.B. minors, by and through their
parent, Benjamin Bawidamann,

        Plaintiffs,

        v.

Civ. No.

NORTHMONT CITY SCHOOL DISTRICT
BOARD OF EDUCATION; TONY
THOMAS, in his individual capacity and in
his official capacity as Superintendent of the
Northmont City School District; and LINDA
BLUM, DR. KARL "GERRY" ESPELETA,
THOMAS L. WALKER SR. , JANE
WOODIE, and CHRIS PULOS, all in their
individual capacities and in their
capacities as members of the Northmont City School
District Board of Education,

$3:21\ cv\ 255$

        Defendants.

## COMPLAINT

Plaintiffs, E.B. and K.B. minors, by and through their parent, Benjamin Bawidamann,

*pro se*, hereby file this Complaint against Defendants, Northmont City School District Board

of Education ("School Board"); Tony Thomas, in his individual capacity and in his official

capacity as Superintendent of the Northmont City School District; and Linda Blum, Dr. Karl

"Gerry" Espeleta, Thomas L. Walker Sr., Jane Woodie, and Chris Pulos, all individual elected

officials sued in their individual capacity and in their capacity as members of the School Board

(collectively, "Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as

follows:

1

## PARTIES

1.      Plaintiff E.B. and K.B. are minor children who reside inNorthmont City School District ("NCSD"), in Montgomery County, Ohio. Plaintiffs E.B and K.B. are and were at all times relevant hereto students at a Northmont City School District public school. Suit is brought herein on E.B. and K.B.'s behalf by their Father, Plaintiff  Benjamin Bawidamann.

2.      Plaintiff  Benjamin Bawidamann is an adult individual who is a resident and taxpayer in the Northmont City School District, in Montgomery County, Ohio. Plaintiff Benjamin Bawidamann is the parent of Plaintiffs E.B and K.B.

3.      Defendant Northmont City School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Northmont City School District.

4.      Defendant Tony Thomas was at all relevant times the Superintendent of the Northmont City School District; in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Northmont City School District. He is sued in his official and individual capacities.

5.      Defendant Linda Blum is a Montgomery County resident and member of the School Board, sued here in her individual and representative capacity. Lind Blum is currently the President of the School Board.

6.      Defendant Dr. Karl "Gerry" Espeleta, is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity.

7.      Defendant Thomas L. Walker Sr. is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity.

8.      Defendant Jane Woodie is a Montgomery County resident and member of the School Board, sued here in her individual and representative capacity. Jane Woodie is currently the Vice President of the School Board.

9.      Defendant Chris Pulos is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity.

10.     At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

## JURISDICTION AND VENUE

11.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

12.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

13.     There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

14.     Plaintiffs have no adequate remedy at law.

15.     Venue is proper before the United States District Court for the Southern District of Ohio under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Southern District of Ohio.

## FACTS

16.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

**A.      Northmont School District Board of Education**

17.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

18.     The Northmont School District Board of Education is

"made up of five citizens who are elected by district voters to serve four year terms."

Board - Northmont City Schools (northmontschools.com)

19.     The five individuals currently serving as School Board Members are Defendants Linda Blum, Dr. Karl "Gerry" Espeleta, Thomas L. Walker Sr., Jane Woodie, and Chris Pulos.

20.     Defendant Tony Thomas, Superintendent of the District, has a Bachelors of Arts in comprehensive social studies, and a master's degree.

21.     Defendant Linda Blum, the President of the School Board, is a former secondary mathematics teacher with a degree from the University of Cincinnati. Although there is no oficially signed Oath of Office, Linda Blum took an oral Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as President of the School Board to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." R.C. 3313.10

22.     Defendant Dr. Karl "Gerry" Espeleta has an undergraduates degree in Chemistry and a Graduates degree in Dentistry. Although there is no oficially signed Oath of Office, Dr. Karl "Gerry" Espeleta took an oral Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." R.C. 3313.10

4

23.     Plaintiffs cannot confirm whether Defendant Thomas L. Walker Sr. holds a college degree. Although there is no oficially signed Oath of Office, Thomas L. Walker Sr. took an oral Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." R.C. 3313.10

24.     Plaintiffs cannot confirm whether Defendant Chris Pulos holds a college  degree. Although there is no oficially signed Oath of Office, Chris Pulos took an oral Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." R.C. 3313.10

25.     Defendant Jane Woodie, the Vice President of the School Board, is a graduate of the Ohio State University. Although there is no oficially signed Oath of Office, Jane Woodie took an oral Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as a Board Member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." R.C. 3313.10

26.     This five-member School Board unanimously appointed Defendant Tony Thomas to serve as Superintendent of Schools, effective August 1st, 2016.

27.     As Superintendent, Mr. Thomas is charged with the administration of the NCSD.

5

**B.**     **Relevant Policies of the Northmont School District Board of Education**

28.     Code po0118 of Section 0000 of the School Board's policy manual, titled

"PHILOSPOHY OF THE BOARD" A Board of Education is a legal entity for providing a system of

public education within a geographic area of the State of Ohio. The system was created by, and is governed

by, State statutes. Members of a Board are, therefore, State officers chosen by citizens to represent them

and the State in the legislative management of the local schools.

The Board of Education has the dual responsibility for implementing statutory requirements pertaining to
public education and for meeting the desires of the citizens. While the Board has an obligation to determine
and assess citizen desires, it is understood that when the citizens elect delegates to represent them in the
conduct of specified educational programs, they, at the same time, endow their representatives with the
authority to exercise their best judgment in determining policies, making decisions, and approving
procedures for carrying out the responsibility.

The Board declares and, thereby, reaffirms its intent to:

A  maintain two-way communications with citizens of the District. The Board shall keep them informed of
   the progress and problems of the School District, and the citizens shall be urged to bring their aspirations
   and concerns about the District to the attention of this body;
B  establish policies and make decisions on the basis of declared educational philosophy and goals;

C   act as a truly representative body for citizens in all matters related to programs and operations. The
Board
     recognizes that ultimate responsibility for public education rests with the State, but the Board of
Education        has been assigned specific authority through statute, and the Board shall not relinquish or
fail to exercise that authority.

29.     In addition, the Board's Policy Manual at Section 0000, Code po0121 provides,

The United States Constitution leaves to the individual state's responsibility
for public education.

The Ohio General Assembly is under mandate by the Constitution of Ohio
to provide for the organization, administration and control of a public
school system supported by public funds.  The Ohio State Constitution also
calls for a State Board of Education and a Superintendent of Public
Instruction.

The General Assembly has outlined the duties of the State Board of
Education and the Chief State School Officer.  It has also established a State
Department of Education (through which policies and directives of the State
Board and Superintendent of Public Instruction are administered) and has
established specific types of school districts.

The Northmont City School District is classified as a city school district
governed by a locally elected Board of Education, hereinafter referred to as

6

the "Board", which is constituted and governed by Code Title 33 of the Revised Code of the State of Ohio. **EXHIBIT A**

https://go.boarddocs.com/oh/northmont/Board.nsf/Public?open&id=policies#

30. Furthermore, for its "Educational Philosophy and Mission of the District", the

Policy Manual at Section 2000, Code po2105 declares,

The Board of Education believes that the purpose of education is to facilitate the development of the potential of each student. *In a free society, every individual has both the right and responsibility to make choices and decisions for himself/herself and for society. A prerequisite for every member of such a society in meeting those responsibilities is competence in the use of the rational thought processes needed to make intelligent, ethical choices and decisions. If our society, as originally conceived, is to survive and function effectively, its young people need to be prepared to exercise their rights and their responsibilities in ways that benefit them and the society. Likewise, if individuals are to be able to achieve their life goals in a free society, they need to be competent to choose among the myriad alternatives that are and continue to be available to them.*

https://go.boarddocs.com/oh/northmont/Board.nsf/Public?open&id=policies# (emphasis added).

**The authority for the organization of the School District is based on the Constitution of the State of Ohio. The schools shall operate within the laws of the State and the Standards of the Ohio Board of Education.**

*School funds.*
*§2 The General Assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State; but, no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this State. (1851)*
**(See attached Exhibit B) Article VI: Education §2 p. 36**

The School District shall maximize available resources in the pursuit of academic excellence while maintaining accountability to the public served. The School District shall continue to call upon the collective

7

resources of this unique community in meeting the changing educational requirements of the future. The Board of Education believes that the purpose of education is to facilitate the development of the potential of each student.

**All students shall have an equal opportunity to gain an education without regard to race, sex, color, creed, national origin, talent, disability, or socioeconomic background.**

<u>**Outcomes of Education**</u>

As a result of interaction between students and the various elements of the School System, the following outcomes shall be sought:

c. **The development of intellectual skills in problem solving, decision making, critical thinking, self-discipline, self-direction, and the personal commitment to ideals,**

d. **The development of respect for individual differences and diverse opinions,**

e. **the development of skills required to effectively function in the American social, economic, and political systems, and Principals of American democracy.**

31.     Moreover, Section 8000, Code po8420.01, titled "PANDEMICS AND OTHER MEDICAL EMERGENCIES", provides, in pertinent part,

A pandemic is an outbreak of an infectious disease. The Superintendent shall set up a Pandemic Response Team ("PRT") to develop a Pandemic Plan in coordination with local government and law enforcement officials.

\*\*\*

The Pandemic Plan should be reviewed annually by the PRT and updated as appropriate.

https://go.boarddocs.com/oh/northmont/Board.nsf/Public?open&id=policies#

32.     Northmont Board Policy Section 0000, po0123, titled "CODE OF ETHICS/CODE OF CONDUCT", provides, in pertinent part,

The Board of Education believes quality public education and good Board service should be conducted in an ethical manner with traditional principles such as honesty, trust, fairness, and integrity.

8

Each Board member should conform his/her conduct to Ohio law, the code of ethics recommended by the Ohio School Boards Association and the code of conduct set forth below as adopted from the National School Boards Association publication *Becoming a Better Board Member*

      A. remember that my first and greatest concern must be the educational welfare of all students attending the public schools

      B. obey the laws of Ohio and the United States;

      G. encourage ongoing communications among Board members, the Board, students, staff, and the community

      https://go.boarddocs.com/oh/northmont/Board.nsf/Public?open&id=policies#

33.     Finally, Northmont Board Policy Section 0000, po0123, titled "CONFLICT OF INTEREST", provides, in pertinent part, A Board member shall not have any direct or indirect pecuniary interest in a contract with the District

N.    a Board member from using the authority or influence of office to secure anything of value or the promise of anything of value to the Board member, from soliciting or accepting anything of value that is of such a character as to manifest an improper and substantial influence upon the Board member with respect to his/her duties   https://go.boarddocs.com/oh/northmont/Board.nsf/Public?open&id=policies#

## C. NCSD's COVID-19-Based Measures

34.     On August 19, 2021, Defendant Tony Thomas sent a text link to Northmont teachers, staff, parents, students and community (the "mask mandate") stating as follows:

      UPDATED MASK PROTOCOL

August 19, 2021
Dear Families,
The school district has worked diligently to navigate the pandemic with our students' safety our top priority. The Ohio Department of Health continues to recommend students should be in class five days a week and we agree students need to be in our buildings for both academic and social reasons. With the rise in COVID cases and the resulting quarantines from exposure we believe it is time to make a change to our masking policy.
Recently Governor DeWine and the Ohio Department of Health Director, Dr. Bruce Vanderhoff, appealed to parents and school officials to bring back mask requirements especially for students in age groups not eligible for the vaccine. The Health Department still states the best way for schools to remain open is for those eligible for the vaccine to get the vaccine. The Governor and

Director also stated that if a child cannot be vaccinated, they should wear a mask. The message was clear, if schools are to remain open then vaccinations and wearing masks are needed to keep the virus from spreading. New case reports are matching last February's numbers and are on the rise.

Recognizing our youngest population is not yet eligible for the vaccine we need to add a layer of protection. As a result of the information from the Governor and the Director, we will add a layer of protection to our **Pre-K-6 students with a mask requirement beginning Monday, August 23, 2021**.

Wearing masks in grades 7-12 is strongly recommended. We are seeing many quarantine situations that could be avoided if students were wearing masks or were vaccinated. If you would like your child to stay in school, have them wear a mask. Masks are still required on school buses for all students.

Adding this layer of protection for our youngest learners will eliminate quarantines when exposed to a positive COVID-19 case. The outcome we are seeking is to keep kids in school safely. Our parents and community have been supportive throughout these trying times and we are confident that you will help us keep kids in school. **We will continue to monitor the number of cases and other recommendations from the medical community and adjust our protocols accordingly.**

Updated Mask Protocol - Northmont City Schools (northmontschools.com)

See attached **Exhibit C**

**D. Plaintiffs Place Defendants on Notice of Lawsuit.**

35.     After receiving notice of the Superintendent's text, Plaintiff, Benjamin Bawidamann, Later e-mailed a response to the Defendants informing them that he would be filing a lawsuit due to the Defendants' violation of Ohio's open meetings laws and violation of the United States and Ohio Constitutions through their commission of unauthorized restrictions of liberty; identification of a minor as a potential public health risk with no jurisdiction; identification and declaration of a minor as a potential public health risk with no evidence; declaration of mandates to restrict a minor's liberty with no legal jurisdiction; declaration of mandates that have no legal jurisdiction to restrict civil liberties; declaration of mandates restricting liberties with no prior public comment; declaration of mandates imposing dress code that does not align with dress code regulations; declaration of mandates as medical experts; and deprivation of students' and parents' civil liberties with no authority." See **Exhibit D**.

10

36.     In his letter, Mr. Bawidamann also informed Defendants that he was sending a copy of the letter to Ohio Attorney General David Yost, a copy of which letter is attached hereto as **Exhibit E**.

37.     Mr. Bawidamann concluded his letter by noting that he would be seeking a temporary restraining order unless the purported "mandate" was not rectified by the close of business on August 23, 2021. See **Exhibit D**.

Mr. Bawidamann followed up the next day by hand delivering copies of the Notice of temporary restraining order and the school medical notice to the Principle of E.B. and K.B.'s school along with the superintendent Tony Thomas.

Mr. Thomas replied to Mr. Bawidamann's initial contact email. Mr. Thomas was offering for Mr. Bawidamann to sign an Exemption form for the mask mandate. **See Attached Exhibit F**


Mr. Bawidamann declined to sign the exemption and replied that the signing of this form could constitute a tacit acknowledgement of authority that neither you nor the board have to illegally enforce an unconstitutional declaration. There are reasons our governor had no power to enforce this mandate. It appears that you, the school board, or both, have tried to assume that power. I both reserve and assert my parental rights in this matter. School districts don't have authority to issue laws of general applicability concerning health issues such as this. Please let me know what authority you are invoking, legal jurisdiction from which you, the board, or both, are acting, to usurp parental rights and restrict minors of their civil liberties, by mandating masks.

**See Exhibit F**

Mr. Thomas Replied to Mr. Bawidamann's email with R.C. 3313.20 and 3313.47

R.C. 3313.20  being Rules, locker search policy and Professional meetings, and R.C. 3313.47 being management and control of schools vested in the board of education. along with his asertion that he was well within his juridiction to impose a mask mandate, along with issuing a soft threat that if my daughters refused to wear a face covering, in the absence of my children being approved for a recognized exemption, It would force the district to recommend the child(ren) referral to a remote learning environment.

**See  Exhibit F**

On September 13th Mr. Bawidamann attended the Northmont board of eduacatoin meeting an let the board members know tht they were in violation of the Ohio constitution Article 1 section 21.  Entitled : Preservation of the freedom to choose healthcare and healthcare coverage.  **See attached Exhibit G** stating the the school has in effect created a healthcare system and compelling the students, staff, and parents to participate, or have penalties levied against children, parents, or staff.

During Mr. Bawidamann's time to speak, he again, notified the board that if they did not recind the mask mandate that a lawsuit would be filed against them. Mr. Bawidamann made it clear that if they did not receive notification of a second notice to sue, that this would serve verbally as that notice.  **See attached exhibit Q**

The board disregarded anything Mr. Bawidamann and other parents speaking out about mask policy mandates, as the board proceeded to extend the policy/mandate to the Middle school and Highschools of the Northmont City School District scheduled to go into effect two days later on Wednesday, September 15th 2021.  **See attached Exhibit H**

**E. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.**

38.     In his Affidavit, attached hereto as **Exhibit I**, Stephen E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:

***

3.     I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia). My curriculum is attached hereto as **Exhibit i**.

4.     I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas.    My list of representative cases is attached hereto as **Exhibit ii**.

5.     For example, I am currently serving as an expert in the Monsanto Roundup and 3-M PFAS litigation.   Recently I testified in four trials for the DuPont C-8 litigation.

6.     I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

7.     I hold nine U.S. patents, most related to heating, ventilation and air conditioning (HVAC) systems.

8.     I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

9.     I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health

and well-being, or significant discomfort among workers or among the citizens of the community.

10.     Industrial Hygiene is fundamentally concerned the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls and personal protective equipment, among other things.

11.     Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

12.     On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

13.     Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 $\mu$ (microns) in size. By comparison, droplets are >5 $\mu$ to >10 $\mu$ in size.

14.     A square micron is approximately 1/4000th the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are —1/10 of a micron or —1/40,000th the area of a cross section of a human hair or —1/1,000th the diameter of a human hair.

15.     A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25$\mu$ to 0.5$\mu$ in size.  Particles smaller than 5$\mu$ are considered very small and/or very fine or aerosols.

16.     Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

17.     Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

18.     Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

19. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

20. For many reasons, personal protective equipment (PPE) is the least desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

21. Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

22. The AIHA, in their September 9, 2020 Guidance Document for COVID-19 (**Exhibit iii**) noted that the acceptable relative risk reduction methods must be ≥90%; mask were shown to be only 10% and 5% (see Exhibit iii - Figure 2) and far below the required 90% level.

23. Similarly, Shah, et al, 2021 (**Exhibit iv**), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower.

24. Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

25. Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

26. PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings do not appear anywhere in the Industrial Hygiene (IH) Hierarchy of Controls for very small airborne aerosols like Covid-19. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

27. Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings do not provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

28. For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial

coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

29.    I have reviewed the Northmont City School District (NCSD) "Protective Facial Covering Policy During Pandemic/Endemic Events" as set forth in the Policy Manual of the NCSD Board of Education.

30.    Ordinary facial coverings like the ones required by the NCSD facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

31.    Because of the gaps around the edges of facial coverings required by NCSD's policy, they do not filter out Covid-19 aerosols.  The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

32.    The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

33.    Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

34. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

35. Ordinary cloth facial coverings like the ones required by the NCSD mask requirement do not provide any filtering benefit relative to particles smaller than $5\mu$ if not sealed.

36. Substantial mitigation of Covid-19 particles could be immediately achieved by:

    a.  opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

    b.  setting fresh air dampers to maximum opening on HVAC systems,

    c.  overriding HVAC energy controls,

    d.  increasing the number of times indoor air is recycled,

    e.  installing needlepoint ionization technology to HVAC intake fans, and

16

    f.  installing inexpensive ultraviolet germicide devices into HVAC systems.

37.    All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

38.    Extended use of respiratory PPE is not indicated without medical supervision.

39.    As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 201, in the *International Journal of Environmental Research and Public Health* and that is attached to this Affidavit as **Exhibit iv**, the following negative effects from wearing masks was reported in the literature:



**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit iv, p. 25. In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the

public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit iv, p. 24. For these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

40. In summary:

   a. PPE is the least desirable way to protect people from very small airborne aerosols.

   b. Facial coverings as required by the NCSD policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

   c. If PPE were to be used for protection, respirators, not facial coverings as required by the NCSD policy are needed to provide any effective protection from very small airborne aerosols.

   d. Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.

   e. Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

   f. Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

39. Plaintiffs note that the state of Ohio was given $4,475,243,513 pursuant to the American Rescue Plan ("ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts. See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit J**. See also, https://oese.ed.gov/files/2021/07/Ohio-ARP-

ESSER-State-Plan-Highlights-v2-071421.pdf. The letter links to the CDC guidelines available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html. The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letter notifying them that they will not receive ARP funds. Accordingly, it seems Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

40. Plaintiff Benjamin Bawidamann, in his own capacity and on behalf of his minor children, E.B and K.B., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by E.B. and K.B. because E.B. and K.B. are required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT I - 42 U.S.C. §1983 – Violation of Procedural Due Process (5th and 14th Amendments) Against All Defendants

41. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

42. In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

43. In the instant case, Defendants unquestionably acted under the color of state law.

44.     Each Individual Defendant is an elected, voting member of the Northmont City School District Board of Education with the exception of Defendant Tony Thomas, who is the Superintendent of the Northmont City School District.

45.     Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

46.     The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

47.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

48.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the Unites States Constitution.

49.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

**COUNT II - 42 U.S.C. §1983 - Violation of Substantive Due Process
(Fourteenth Amendment) – Against All Defendants**

50.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

51.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

52.     In the instant case, Defendants unquestionably acted under the color of state law.

53.     Each individual Defendant is an elected, voting member of the Northmont City School District Board of Education with the exception of Tony Thomas, who is the Superintendent of the Northmont City School District.

54.     Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

55.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

**COUNT III - Violation of Procedural Due Process
(OH Const. Art. I, § 16) Against All Defendants**

56.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

57.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

58.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

59.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

60.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, § 16 of the Ohio Constitution.

61.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

**COUNT IV - Violation of Substantive Due Process**
**(OH Const. Art. I, § 16) Against All Defendants**

62.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

63.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy

by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

64.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

65.     Under Article 1, § 16 of the Ohio Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

66.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## RESERVATION OF RIGHTS

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Ohio, including claims arising from any violations of Ohio's Open Meetings Laws or other actions of misconduct that may have been committed by Defendants.    Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.      Assume jurisdiction of this action;

b.      Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

c.      Declare that the Defendants' masking policy is void and without legal force or effect;

c.      Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

d.      Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Ohio;

e.      Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law; and

f.      Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.


Respectfully submitted this 20th day of September, 2021.

                                        */s/ Benjamin Bawidamann*
                                        308 Meadowgrove Drive
                                        Englewood, OH 45322
                                        (937) 554-2073    (Telephone)
                                        bbawidamann@gmail.com (email)


                                        Benjamin Bawidamann, Individually and on
                                        behalf of his minor children E.B. and K.B.